# IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**IN RE: OPIOID LITIGATION**                                **Civil Action No. 19-C-9000**

## THIS DOCUMENT APPLIES TO ALL CASES

### COMMON BENEFIT FUND COMMISSIONER'S RECOMMENDATIONS REGARDING ATTORNEY FEES AND EXPENSES

Finding that authorization of a Common Benefit Fund and appointment of a Common Benefit Fund Commissioner "will help fairly and expeditiously resolve matters in this Mass Litigation," the Mass Litigation Panel ("Panel") appointed the undersigned to serve as Common Benefit Fund Commissioner ("Commissioner") on October 4, 2021. *Order Authorizing Common Benefit Fund and Appointing a Common Benefit Fund Commissioner* (Transaction ID 66985632) at 4. Subsequently, on November 4, 2021, the Panel established the Common Benefit Fund ("the Fund") to provide "a single process for awarding attorneys' fees and case costs" across this entire Mass Litigation. *Order Establishing Common Benefit Fee Fund* (Transaction ID 67071292) at 3. The Panel ordered the undersigned, as Commissioner, to recommend "an allocation of the amount of the gross attorneys' fees award to provide for both Common Benefit work performed by Plaintiffs' counsel as well as work Plaintiffs' counsel have undertaken to represent their own clients pursuant to contingency fee agreements, while recognizing that an individual attorney or law firm may be eligible for fees both for Common Benefit Work and for work done in furtherance of representing a specific client under a contingency fee agreement." *Id.*

In a recent opinion, the Supreme Court of Appeals of West Virginia discussed the "common fund doctrine" and adopted the persuasive authority of the Restatement (Third) of Restitution and Unjust Enrichment § 29 (Am. Law Inst. 2022), in its entirety, as the law of this State. Syl. Pt. 3, *L&D Investments, Inc. v. Antero Resources Corporation,* --- W.Va. ---, 887 S.E.2d 208 (2023). Acting pursuant to the law of this State and the Panel's Orders, and after

**Exhibit B**

having extensively reviewed and considered these matters as set forth in greater detail below, the Commissioner makes the following recommendations concerning the payment and allocation of attorneys' fees and litigation expenses in connection with the above-captioned consolidated litigation.

## I.    RELEVANT BACKGROUND

### A.  The Opioid Litigation and Resulting Settlements

The West Virginia consolidated opioid litigation is arguably the largest and most complex legal undertaking in the history of West Virginia jurisprudence. The State, together with nearly every county and city throughout West Virginia, filed lawsuits against entities they allege to be responsible for the opioid epidemic in West Virginia, including: 1) manufacturers of prescription opioids; 2) distributors of prescription opioids; and 3) pharmacies that distributed and/or dispensed prescription opioids. These lawsuits were filed in both federal and state courts of West Virginia.

This consolidated Mass Litigation was created as a result of the lawsuit filed on December 13, 2017, by eight West Virginia County Commissions in the Circuit Court of Marshall County, West Virginia, styled *Brooke County Commission, et. al. v. Purdue Pharma L.P.*, *et. al.*, Civil Action Nos. 17-C-248 through 17-C-255 (hereinafter "*Brooke County*"). In *Brooke County*, the Defendants removed the action to the United States District Court for the Northern District of West Virginia and immediately sought to transfer the case to the United States District Court for the Northern District of Ohio where the federal opioid consolidated multidistrict litigation was pending, *In Re: National Prescription Opiate Litigation*, MDL No. 2804. The *Brooke County* Plaintiffs filed an *Emergency Motion to Remand* which was granted by Order entered February 23, 2018. After the entry of this remand Order, other West Virginia governmental plaintiffs in this

**Exhibit B**

consolidated litigation filed Complaints in Marshall County utilizing the precedent created in *Brooke County.*[1]

In *Brooke County*, the opioid Defendants filed multiple motions to dismiss attacking every count of the Complaint all of which were denied by the Circuit Court of Marshall County. The Defendants then filed four (4) Petitions for *Writ of Prohibition* with the Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court") concerning the Circuit Court of Marshall County's denial of their motions to dismiss in *Brooke County,* which were unanimously refused.

On June 7, 2019, the West Virginia Supreme Court granted Defendants' Motion to Refer to the Mass Litigation Panel and transferred *Brooke County* and other related cases to the Panel. The Court authorized the Panel to transfer and join with the existing Mass Litigation "any civil actions involving the same or similar common questions of law or fact subsequently filed in any circuit court of West Virginia" as well as any actions "remanded to any circuit court in West Virginia from federal court." On June 14, 2019, the Panel created *In Re: Opioid Litigation*, Civil Action No. 19-C-9000, pending in the Circuit Court of Kanawha County. *Order Assigning Judges, Transferring Civil Actions to the Circuit Court of Kanawha County, West Virginia, and Designating Litigation for Electronic Filing and Service,* entered on June 14, 2019. Immediately after the creation of this Mass Litigation, Motions to Dismiss in *Monongalia County Commission, et. al. v. Purdue Pharma L.P.*, *et. al.*, Civil Action Nos. 18-C-232 through 18-C-236 ("*Monongalia County*"), the second multi-plaintiff lawsuit filed and litigated in state court which was also originally filed in the Circuit Court of Marshall County, were fully briefed. These motions were denied by the Panel who adopted and applied the rulings in *Brooke County* as the law of the case

---

[1] All West Virginia counties and municipalities that filed in state court but did not utilize the precedent created by *Brooke County* were removed to federal court and are now pending in the MDL. The plaintiffs in those cases filed Motions to Remand which were all denied by the MDL Court.

**Exhibit B**

going forward in this litigation. Defendants thereafter filed their fifth Petition for *Writ of Prohibition* challenging that Order which was refused by the West Virginia Supreme Court.

In September 2021, the Panel described its coordinated and phased trial plan designed to facilitate a single, statewide abatement remedy if liability for public nuisance was proved:

> The Panel intends to conduct expedited bench trials and conclude the liability phase of **all** public nuisance cases by the end of 2022 including the Manufacturer Cases, the Distributor Cases, and the Dispenser Cases. If one or more Defendants are found to be liable, the Panel will then set an expedited bench trial on causation and abatement. The Panel intends to hear evidence on a single, state-wide abatement remedy and will consider allocation of fault amongst those Defendants found liable for purposes of inchoate contribution. If abatement is warranted, the Panel will consider an award of attorney fees as a component of any equitable remedy which will replace enforcement of contingency fees.

*Order Regarding Voluntary Dismissal of Legal Claims Discussed During September 10, 2021 Status Conference* (Transaction ID 66980151) at 1, entered on September 30, 2021. The Panel then ordered three bifurcated and expedited bench trials with one trial for each Defendant Group, specifically:

- A Phase I bench trial on the State's public nuisance and WVCCPA claims against the Manufacturer Defendants set to begin on April 4, 2022.[2]

- A Phase I bench trial on the County/City Plaintiffs' claims for equitable public nuisance against the Distributor Defendants set to begin on July 5, 2022.[3]

- A Phase I bench trial on the State's public nuisance and WVCCPA claims against the Pharmacy Defendants set to begin on September 12, 2022.[4]

---

[2] *Order Granting Plaintiff's Motion to Sever Cases for Bench Trial on Expedited Basis* (Transaction ID 66821121) entered on August 4, 2021.

[3] *Order Regarding Voluntary Dismissal of Legal Claims Discussed During September 10, 2021 Status Conference* (Transaction ID 66980151) entered on September 30, 2021; and *Amendment to Order Regarding Voluntary Dismissal of Legal Claims Discussed During September 10, 2021 Status Conference* (Transaction ID 66992889) entered on October 6, 2021. In this Phase I trial, the Panel found that all cases filed by the City/County Plaintiffs involved common questions of law or fact such that consolidation of these cases for trial was appropriate under Rule 42(a).

[4] *Order Regarding Rulings Issued During September 10, 2021 Status Conference* (Transaction ID 66922721).

**Exhibit B**

*See also* October 27, 2021, *Order* (Transaction ID 67047934) at 2. With respect to the State's public nuisance and WVCCP claims against the Manufacturer and Pharmacy Defendants, Motley Rice law firm served as Lead Counsel. With respect to the County and City Plaintiffs' consolidated trial against the Distributor Defendants, the Panel appointed Bob Fitzsimmons (Fitzsimmons Law Firm PLLC) and Paul T. Farrell, Jr. (Farrell & Fuller LLP) as Co-Lead Counsel. *Order Appointing Co-Lead Counsel on Behalf of City/County and Hospital Plaintiffs*, (Transaction ID 66989112) entered on October 5, 2021.

Statewide global settlements were reached with all Defendants with the gross amount collectively totaling at least $940,386,000.00.[5] The negotiations which led to these settlements were highly complex and required extraordinary skill. These settlements will also provide West Virginia with vastly superior benefits than if the Plaintiffs participated in national settlements involving these same Defendants or pursued cases outside this litigation.

All fifty-five West Virginia counties and virtually all participating municipalities, representing approximately 99.6 percent of the population of West Virginia, entered into the West Virginia First Memorandum of Understanding ("West Virginia First MOU"). The West Virgina First MOU is comprehensive and specifies the distribution, allocation, application, and use of all settlement funds recovered on behalf of the State and Local Governments in opioid-related litigation.[6] *See Motion to Adopt the West Virginia First Memorandum of Understanding*,

---

[5] The settlements included: Distributor Defendants $400,000,000.00; Allergan $51,200,000.00; CVS $82,500,000.00; Janssen $99,000,000.00; Rite Aid $5,000,000.00; Teva $83,331,000.00; Wal-Mart $65,070,000.00; Walgreens $83,000,000.00; Kroger $68,000,000.00; and Remnant Defendants $3,285,000.00.

[6] Excluded from the West Virginia First MOU are settlements the State, by and through the Attorney General, entered into with any Pharmaceutical Supply Chain Participant prior to December 1, 2021; the claims of Cabell County and the City of Huntington against the Distributor Defendants, which were tried in the United States District Court for the Southern District of West Virginia; or any claims asserted by the State and/or the West Virginia Attorney General against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust law, state criminal law, or claims asserted pursuant to W. Va. Code § 9-7-6(c) or for Medicaid reimbursement. For the avoidance of doubt, the

**Exhibit B**

(Transaction ID 68760098) filed on December 29, 2022. The above referenced settlements were negotiated and agreed upon in reliance on the terms and conditions of the West Virginia First MOU. *Id*., at 2. The West Virginia First MOU has been adopted by the Panel to govern the "allocation, distribution, and payment of all recoveries in connection with the claims asserted by the State of West Virginia and any West Virginia County and City" in the consolidated civil action, *In Re: Opioid Litigation,* Civil Action No. 19-C-9000. *Order Adopting the West Virginia First Memorandum of Understanding* (Transaction ID 68796699) at 1, entered on January 4, 2023. The West Virginia legislature enacted a bill recognizing the creation of the West Virginia First Foundation pursuant to the terms of the West Virginia First MOU. 2023 West Virginia Senate Bill No. 674, adding West Virginia Code §§5-30-1 through 5-30-5, passed March 10, 2023; in effect from passage.

### B.   Orders and Background Regarding the Payment of Attorney Fees

On October 1, 2021, Plaintiffs' Coordinator moved for authorization and establishment of a common benefit fund pursuant to W. Va. R. Civ. P. 53. *Plaintiffs' Coordinator's Motion for Entry of Order Authorizing Common Benefit Fund and Appointing Common Benefit Fund Commissioner* (Transaction ID 66983764) at 5 (explaining "the authorization of a common benefit fund is an appropriate and often necessary exercise of a trial court's case management and equitable authority to ensure the fair and expeditious resolution of the matters before it"). The Coordinator's Motion sought to create a common benefit fund to reimburse and compensate for expenses incurred and work performed for the common benefit of Plaintiffs in the West Virginia courts in the event money was recovered through litigation or settlement. *Id.* at 1.

---

settlement by the State with McKinsey & Company is included, and those funds were earmarked as seed funds for the Foundation.

**Exhibit B**

On October 4, 2021, the Panel entered an *Order Authorizing Common Benefit Fund and Appointing a Common Benefit Fund Commissioner* (Transaction ID 66985632), finding that doing so would "help fairly and expeditiously resolve matters in this Mass Litigation" and appointed the undersigned to serve as Common Benefit Fund Commissioner ("Commissioner"). *Id.* at 4. Subsequently, on November 4, 2021, the Panel established the Common Benefit Fund ("the Fund") to provide "a single process for awarding attorneys' fees and case costs" that will apply across the entire Mass Litigation. *Order Establishing Common Benefit Fee Fund* (Transaction ID 67071292) at 3.

The Panel ordered the Commissioner to recommend, subject to the Panel's review, "an allocation of the amount of the gross attorneys' fees award to provide for both Common Benefit work performed by Plaintiffs' counsel as well as work Plaintiffs' counsel have undertaken to represent their own clients pursuant to contingency fee agreements, while recognizing that an individual attorney or law firm may be eligible for fees both for Common Benefit Work and for work done in furtherance of representing a specific client under a contingency fee agreement." *Id.*[7]

The Panel ordered the following factors to be considered in recommending or approving awards of attorneys' fees:

- The benefit provided by the attorney's work to obtain a judgment in or settlement of the case; work that is not authorized by Plaintiffs' Coordinator or by Co-Lead Counsel for the Distributors litigation and/or that is repetitive or duplicative of other work will not be eligible for compensation as common benefit work;

- The payment to which the attorney would be entitled pursuant to his or her contingency fee agreements, which shall be considered as relevant, though not determinative, as to the amount of an award; and

---

[7] "[A]ll payments awarded to attorneys based upon consideration of contingency fee agreements shall be determined by the Common Benefit Fund Commissioner using a fair and equitable process, with any award subject to review by the Panel for reasonableness based upon the factors recognized under applicable West Virginia law." *Id.* at 4.

**Exhibit B**

- The attorney's assistance to the administration of the claim for statewide public nuisance and the allocation of any recovery for the abatement of the nuisance if the Court finds the Plaintiffs prove the existence of a public nuisance, including joining a memorandum of understanding reached among Plaintiffs to govern the allocation and use of funds obtained through the litigation.

*Id.* at 4-5.

The Panel further ordered that: (1) Plaintiffs' attorneys or law firms seeking to recover Common Benefit attorney's fees must report their time contemporaneously and in a uniform fashion to the Court-appointed Time Manager; (2) submissions to the Time Manager must provide sufficient detail to make a determination whether the work described is authorized common benefit work, with the Time Manager's determination subject to review by the Commissioner; and (3) an attorney's participation in the Expense Assessment Fund shall be a "positive relevant factor" for the Commissioner to consider in awarding Common Benefit attorneys' fees. *Id.* at 5. The Panel also ordered the Commissioner to "determine what general guidelines all attorneys should follow in contemporaneously reporting the work done to ultimately form a portion of the information needed by the Panel in reaching fair and equitable fee determination." *Id.* at 3.

On January 7, 2022, the Commissioner entered an *Order Regarding Attorney Fees*, (Transaction ID 67216768), outlining the "necessary elements" of any reported time: (1) "Time must be contemporaneously reported in a uniform fashion to Time Manager John Jenkins at the following electronic mail address: John.Jenkins@schcpa.com" and (2) "Sufficient detail must be provided when time is reported to determine whether the work described therein is authorized Common Benefit Work, with the Time Manager's determination subject to further review by the Common Benefit Fund Commissioner." *Id.* at 1. The Commissioner ordered that time submissions "will be maintained by Time Manager John Jenkins in a format that will allow them to be sortable and searchable at the appropriate time" and "[a]ll time submissions and expense submissions shall

**Exhibit B**

be submitted in the format approved by Time Manager John Jenkins, and failure to comply will be reason to exclude the time and expenses for consideration of payment or reimbursement." *Id.* at 3.

After consultation with the Coordinator of the Manufacturer and Pharmacy Litigation and Co-Lead Counsel in the Distributor Litigation, the Commissioner adopted the format established in *In Re: National Prescription Opiate Litigation*, N.D. Ohio, 1:17-MD-2804 ("National Opioid MDL" or "MDL"), including the categories of expenses to be reported each month. *Id.* at 3-5. The Commissioner also adopted the "deadlines and the cautions provided in the MDL 2804 orders of May 1st, 2018 (Docket #358), and June 19th, 2018 (Docket #636),[8] urging West Virginia counsel to abide by the same." *Id.* at 4, 5 (finding MDL guidelines about what is and is not compensable work should apply in the West Virginia mass litigation).

The relevant provisions the Commissioner adopted from the National Opioid MDL include, *Id.* at 2-5:[9]

- <u>What is and is Not Compensable as Common Benefit Work?</u> Compensable work is work in the common interest of the MLP and performed by Co-Lead Counsel, Co-Liaisons, the Plaintiffs' Executive Committee, and by Counsel when authorized by Co-Lead Counsel. Examples of compensable work include: Pleadings and Briefs (factual and legal research and preparation based on a specific assignment from Co-Lead Counsel); Depositions (necessary attendance only); Periodic Status Conferences (attending and listening to conferences if specifically authorized by Co-Lead Counsel); Emails and Correspondence (only those attorneys essential to the issue which is the subject of the correspondence); and Review of Court Filings and Orders (only if assigned responsibility for matters being briefed or heard).[10]

---

[8] Docket number 636, which was a later version of the Fee and Expense Order, was vacated on June 19, 2018: "Order [non-document] vacating 636 Case Management Order No. 5 based on Document # 358." Accordingly, the Commissioner adopts the relevant provisions in docket number 358.

[9] For more information, including a detailed description of what is and is not compensable work, the types of work which falls into each acceptable category, travel limitations, and information on billing (i.e., actual cost for services) for contract attorneys used for document review or other services, see *In Re: National Prescription Opiate Litigation*, N.D. Ohio, 1:17-MD-2804, ECF No. 358 (May 1, 2018).

[10] Counsel is eligible to receive attorneys' fees only if the time expended was (a) beneficial to the prosecution of the [litigation]; (b) as to counsel who are not PEC members or Co-Liaison Counsel, authorized in writing by Co-Lead Counsel; (c) timely submitted; (d) reasonable; and (e) non-duplicative. *See In Re: National Prescription Opiate Litigation*, N.D. Ohio, ECF No. 358 at 2 (May 1, 2018).

**Exhibit B**

- <u>Timekeeping and Submission Protocols</u>: Counsel shall record and maintain daily, contemporaneous time records for work performed, including work by attorneys and paralegals, in a sortable, searchable format. Counsel shall indicate "with specificity the hours (in tenth-of-a-hour increments) and billing rate, along with a sufficiently detailed description of the particular activity," as "[c]ounsel will not be reimbursed for any item of time or expense not described in sufficient detail to determine the nature and purpose of the service or expense." Customary billing rates shall be used, though use of these rates does not guarantee their payment as the Court reserves discretion to determine rates.

- <u>Categories of Monthly Expenses Reported</u>: Each time entry must be categorized, with a more specific category used in place of a more general category, when possible. Acceptable categories include Investigation/Factual Research; Attorney Meetings/Strategy; Attorney Communications; Client Communications; Case Management, Legal Research; Pleadings/Motions; Written Discovery/Plaintiffs' Document Production; Court Appearances; Committee Work; Plaintiff's Executive Committee Work; Co-Lead and Co-Liaison Work; Depositions (Prepare/Take/Defend); Document Review Tier 1 (by less senior attorneys through an established platform, usually making initial cut of documents), Document Review Tier 2 (by more senior documents who are coding documents for specific use in a case, reviewing Tier 1 work); Experts/Consultants; Settlement/Mediation; Trial Preparation; Trial; and Appeals.

The Commissioner noted that for past work to be fairly evaluated, "counsel must have an opportunity to present evidence and provide documentation of the work they have performed to date," explaining that it should be submitted in one or more of the following ways, *Id.* at 4-5:[11]

- Submitting contemporaneous time records to the Time Manager;

- If no contemporaneous time records were made, creating to the best of the attorney's ability a summary of the work done in as much detail as possible and submitting it in a narrative format to the Time Manager. Upon receipt, the Time Manger will coordinate with the attorneys to get further information that can go into a database, or if a database is not possible, the Commissioner will consider those narratives at the appropriate time;[12] and/or

---

[11] Although the deadline "to present evidence and provide documentation of the work [Plaintiffs' attorneys had] performed to date" [that is, time prior to the entry of the January 7, 2022 Order] was originally set for February 1, 2022, this deadline was extended to March 1, 2022. *Id.* at 5; *Agreed Order Regarding Attorney Fees Deadline*, Jan. 24, 2022 (Transaction ID 67258280).

[12] Any submission made in narrative form was required to include a supporting affidavit by the responsible or supervising member of the law firm making the submission. *Id.* at 5.

**Exhibit B**

- For attorneys working in the National Opioid MDL 2804, they may rely upon what they have submitted in the MDL, as it relates to work performed in West Virginia. They may re-submit that time to the Time Manager indicating it has been submitted for consideration by the MDL Common Benefit. How that time will be evaluated and treated will be subject to further ruling by the Commissioner and/or the Panel.

After the Commissioner's Order setting forth guidelines for time submissions, Bob Fitzsimmons, Co-Lead Counsel for the Distributor Litigation, worked with the Time Manager to finalize and distribute a Microsoft Excel worksheet for the submission of time and expense records. The MDL worksheet was the starting point for the template, which was subsequently amended twice: (1) on February 7, 2022, to include additional data points for the identification of which category of Defendant (Manufacture, Distributor, Pharmacy, or Multiple) to which work applied, and for stating whether time being submitted had been previously submitted and/or paid as part of a separate litigation; and (2) in October of 2022, to account for the fact that work could apply to Remnant Defendants. Then, throughout 2022 and into 2023, attorneys submitted time records pursuant to the Commissioner's common benefit guidelines.

## II.  <u>AUTHORITY AND JURISDICTION REGARDING ATTORNEY FEES</u>

The Panel has express authority to determine the amount and distribution of attorneys' fees. Part D of the West Virginia First MOU,[13] which was adopted by the Panel on January 4, 2023,[14] expressly authorizes the Panel to award and allocate attorney fees:

> Payment of All Attorneys' Fees and Litigation Expenses shall be awarded consistent with the orders of the Court and upon recommendation of Judge Christopher Wilkes (WVMLP Special Master). Such award shall be final and non-appealable.

---

[13] Attached as Exhibit A to *Motion to Adopt the West Virginia First Memorandum of Understanding* (Transaction ID 68760098) filed on December 29, 2022.

[14] *Order Adopting the West Virginia First Memorandum of Understanding* (Transaction ID 68796699).

**Exhibit B**

The Panel also has the inherent authority to examine and determine the amount of attorneys' fees. Specifically, "[i]n the context of mass tort litigation, 'a court that exercise[s] inherent power to prevent a violation of the lawyers' professional responsibility to charge only reasonable rates would be acting within the parameters of inherent authority as described by the Supreme Court.'" *In re Vioxx Prod. Liab. Litig.*, 650 F. Supp. 2d 549, 560 (E.D. La. 2009) (quoting *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105, 127 (2006)). *See also In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 492 (2006) ("The judiciary has well-established authority to exercise ethical supervision of the bar in both individual and mass actions. This authority includes the power to review contingent fee contracts for fairness."); *In re Rio Hair Naturalizer Prod. Liab. Litig.*, 1996 WL 780512, at *20 (E.D. Mich. Dec. 20, 1996) ("It is well-settled that the court has the inherent authority to regulate contingency fees to ensure that they are not excessive or unreasonable.") (quoting *In re A.H. Robbins Co., Inc.*, 86 F.3d 364 (4th Cir. 1996)).

In addition to this inherent supervisory authority, several courts have relied upon their equitable powers under a quasi-class action theory to regulate contingent fees. *See In re Vioxx*, 650 F.Supp.2d at 558-59; *In re Zyprexa*, 424 F.Supp.2d at 491-92; *In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, No. MDL 05-1708 DWF/AJB, 2008 WL 682174, at *17 (D. Minn. Mar. 7, 2008), *amended in part*, No. MDL 05-1708 DWF/AJB, 2008 WL 3896006 (D. Minn. Aug. 21, 2008). This consolidated litigation is not a class action, nor are the settlements. However, this litigation retains many important characteristics of a class action, so treatment as a quasi-class action is appropriate. Most notably, while many mass tort settlements define eligible claimants as those with pending cases filed by a date certain, the settlement agreements here require near universal participation by ***all*** local governments, even if they have not filed a case and

**Exhibit B**

regardless of whether they have retained counsel. As a practical matter, the settlement agreements in this litigation function much like a class action settlement, where the rights of non-MLP claimants (and non-litigating claimants) are affected. Thus, the Panel has the equitable authority and responsibility to carefully monitor the settlement agreements and all related fee agreements to ensure they are fair to all potential stakeholders.

The Panel's authority to determine attorney fees in this consolidated case is particularly strong because the claims giving rise to the settlement are equitable claims for public nuisance. In this case, Plaintiffs voluntarily dismissed all legal damage claims except their equitable claims to abate a public nuisance. In its September 30, 2021 *Order Regarding Voluntary Dismissal of Legal Claims Discussed During September 10, 2021 Status Conference*, the Panel stated that it intended to conduct "expedited bench trials and conclude the liability phase of all public nuisance cases by the end of 2022" and, ultimately, "[i]f abatement is warranted, the Panel will consider an award of attorney fees as a component of any equitable remedy which will replace enforcement of contingency fees." (Transaction ID 66980151).

Regarding common benefit fees, it is well-established as a matter of equity that the Panel has the power to order payment of common benefit attorneys' fees in the event of a recovery of money through settlement for the benefit of others. This is because the equitable common-fund doctrine recognizes that someone who recovers a common fund for the benefit of another is due a reasonable attorney's fee from the fund as a whole. *Frisenda*, 308 F. Supp. at 874 (internal citations and quotations omitted); Syl. Pt. 1, *Sec. Nat'l Bank & Trust Co. v. William*, 155 W.Va. 1, 180 S.E.2d 46 (1971) (quoting Syl. Pt. 2, *Roach v. Wallins Creek Collieries Co.*, 111 W.Va. 1, 160 S.E. 860 (1931)) ("A court [may] require one party to contribute to the fees of counsel of another party . . . where the plaintiff, suing in behalf of himself and others of the same class, discovers or

**Exhibit B**

creates a fund which *enures to the benefit of all*.") (emphasis added); *Crumlish's Adm'r v. Shenandoah Val. R. Co.*, 40 W. Va. 627, 22 S.E. 90, 95 (1895) ("[R]easonable, customary, and proper charge, if any, on his claim, in favor of those attorneys who had for him and others the conduct of the cause, should be made."). Because the settlements in this case resulted in monetary payments by one or more Defendants for the benefit of multiple Plaintiffs, the Panel possesses equitable authority to authorize payment of common benefit attorneys' fees.

The Panel's authority to establish procedures and determine payment of common benefit attorneys' fees is also widely recognized.[15] *Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004), §§ 10.21-10.225; 14.21-14.216; 22.62; *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1012-19 (5th Cir. 1977) (affirming federal MDL transferee courts' broad case management authority to provide for common benefit assessments); *Landis v. North American Co.*, 299 U.S. 248, 254 (1936) (recognizing "the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"); *see also Frisenda v. Floyd,* 308 F. Supp. 2d 869, 874 (N.D. W. Va. 2018) ("Courts in West Virginia have authority to impose attorneys' fees and costs on a common fund.").

---

[15] In the Panel's *Order Authorizing Common Benefit Fund and Appointing a Common Benefit Fund Commissioner* (Transaction ID 66985632), it recognized its authority to order payment of common benefit attorneys' fees. The Panel further explained that the authority is widely recognized by federal and state courts beyond West Virginia. *See, e.g., Trustees v. Greenough*, 105 U.S. 527 (1881); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing v. Van Gemert*, 444 U.S. 472 (1980); *Goodrich v. E.F. Hutton Group, Inc.*, 681 A.2d 1039, 1044 (Del. 1996) ("The common fund doctrine is a well-established basis for awarding attorney's fees in the [Delaware] Court of Chancery."); *Serrano v. Priest*, 569 P.2d 1303, 1307 (Cal. 1977) ("[O]ne who expends attorneys' fees in winning a suit which creates a fund from which others derive benefits, may require those passive beneficiaries to bear a fair share of the litigation costs.") (internal quotation marks and citation omitted).

**Exhibit B**

### III. <u>ATTORNEY FEE FUND</u>

Having established the Panel's authority to award and allocate attorneys' fees, the Commissioner turns to what amount of attorneys' fees is fair and equitable. The West Virginia opioid litigation is unprecedented in both complexity and importance. The results achieved through settlements in this case will provide significant and crucial abatement funds for West Virginia. The settlements achieved here far exceed those which would have been obtained had the West Virginia Plaintiffs participated in any of the national opioid settlements. These results were achieved through the enormous efforts of the lawyers who undertook the significant risk and workload in prosecuting these claims, and who performed extraordinary work to prepare these cases for trial and conclusion. The lawyers who participated in this monumental undertaking are to be commended for their work and professionalism.

In this litigation, the Panel established three trial tracks with expedited bench trials against the Manufacturer Defendants to be tried by the Attorney General and its special outside counsel, Motley Rice; the Distributor Defendants to be tried by co-lead counsel, Paul T. Farrell, Jr., and Bob Fitzsimmons; and the Pharmacy Defendants to be tried by the Attorney General and its special outside counsel, Motley Rice. Preparing each of these cases for trial involved extraordinary expense, work, and risk. These cases involved complex legal issues, vast amounts of discovery, and substantial fact and expert witness preparation and depositions. Lawyers litigating these cases engaged in extensive pre-trial work including, motion practice and briefing, reviewing hundreds of thousands of documents; engaging in voluminous and time consuming discovery and related ESI and case management issues; engaging in countless discovery disputes that involved meet and confers as well as motion practice; taking and defending hundreds of depositions of fact witnesses, corporate representatives, and experts; developing, engaging, and producing numerous critical and

**Exhibit B**

complex expert opinions and reports involving highly complex regulatory, standard of care, pharmaceutical, public health, and medical opinions; deposing and cross-examining Defendants' experts concerning highly complex and technical areas of regulatory standards, public health, and medicine; engaging in extensive pre-trial briefing and related argument; briefing and arguing dispositive, evidentiary, and *Daubert/Wilt* related motions; developing and implementing trial strategy and associated work; and conducting general pre-trial and trial work. All three cases were fully prepared to be tried as the Distributor Case was settled immediately before opening statements, the Pharmacy Cases were respectively settled shortly before their designated trials, and the Manufacturer Case was settled after several weeks of trial, and right before closing arguments were delivered.

The prosecution of these cases also involved extensive appellate briefing and argument, as Defendants filed numerous Petitions for *Writ of Prohibition.* The orders from the West Virginia Supreme Court regarding these Petitions helped shape the course of this litigation and substantially contributed to the global settlements Plaintiffs were able to negotiate.

The Defendants in this Mass Litigation are also some of the largest pharmaceutical manufacturers, distributors, and retail pharmacies in the world, and this litigation was vigorously defended by some of the country's largest and most experienced corporate defense firms. Defendants also generally resisted settlement discussions throughout the entirety of the pre-trial proceedings requiring these cases to be fully worked up, discovered, and tried.

Additionally, litigation like the West Virginia consolidated opioid litigation "can serve an invaluable public good." *In Re: National Prescription Opiate Litigation*, *Order*, MDL No. 2804, Doc # 3814 (N.D. Ohio, Aug. 06, 2021) (citing *Contingent Fees in Mass Tort Litigation*, 42 Tort Trial & Ins. Prac. L.J. 105, 111 (2006) ("The purposes of mass tort litigation are to deter activities

**Exhibit B**

that harm people and to compensate people who are harmed.")). As Judge Weinstein observed, "[l]itigations like the present one are an important tool for the protection of consumers in our modern corporate society, and they must be conducted so that they will not be viewed as abusive by the public; they are in fact highly beneficial to the public when adequately controlled." *In re Zyprexa Prods. Liab. Litig.*, 424 F.Supp.2d 488, 494 (2006). Accordingly, the attorney fees awarded should be sufficient to ensure that competent counsel continue to be willing to undertake risky, complex, and novel litigation such as this. § 14.122 Manual for Complex Litigation, Fourth, p. 193 (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338-39 (1980) (recognizing the importance of a financial incentive to entice qualified attorneys to devote their time to complex, time-consuming cases in which they risk nonpayment); Third Circuit 1985 Task Force Report, *supra* note 480, at 248)).

In consideration of the foregoing, as well as the exceptional recovery obtained for West Virginia in this consolidated litigation, the Commissioner recommends that there be established an Attorney Fee Fund in an amount of $141,057,900.00, which is equal to fifteen percent (15%) of the gross recovery of the settlements arising from claims asserted in this consolidated litigation. This Attorney Fee Fund should be utilized to pay all contingency fees, the Attorney General's outside counsel's contingency fee, common benefit fees, and approved litigation expenses in this consolidated civil action. The Commissioner finds that this amount is fair, reasonable, and equitable to the clients, the lawyers, and the general public in light of the unique and novel contours of this case. The Commissioner further believes this amount strikes an appropriate and careful balance between the unparalleled complexities and high-risk involved in this litigation while ensuring that sufficient funds are available to address and abate the opioid crisis in our State.

**Exhibit B**

The Commissioner recommends that litigation expenses be reimbursed first from the Attorney Fee Fund. Based upon a review of the litigation expenses submitted, the Commissioner recommends that $13,000,000.00 be set aside from the Attorney Fee Fund for the reimbursement of litigation expenses.  This amount should be sufficient to cover all reasonable expenses advanced in connection with this litigation. Only reasonable litigation expenses incurred for the common benefit of this consolidated civil action should be reimbursable. Any dispute arising as to whether costs are reimbursable from the Attorney Fee Fund should be submitted to and decided by the Commissioner.

In its prior orders, the Panel ordered that an MDL assessment be paid for use of MDL work product, in accordance with the acknowledged or executed MDL Form Participation Agreements. The MDL Court established that this assessment only applies to non-Attorney General settlements. Therefore, the Commissioner recommends that an MDL assessment be paid on the $400 Million Distributor settlement, and this assessment be paid from the gross settlements recovered in this consolidated civil action.

### IV. <u>ALLOCATION OF ATTORNEY FEE FUND</u>

After reimbursement of the estimated and reasonable litigation expenses, the Attorney Fee Fund is reduced to $128,057,900.00. The Commissioner recommends that this amount be used to pay contingency fees for the local governments' attorneys, contingency fees for the Attorney General's special outside counsel, and common benefit fees as set forth below.

In making the determination of how to allocate the Attorney Fee Fund, one of the most important factors is the "degree of the success obtained." *In re Cook Med., Inc., Pelvic Repair Sys. Prod. Liab. Litig*., 365 F. Supp. 3d 685, 700 (S.D.W. Va. 2019) (citing *Farrar v. Hobby*, 506 U.S. 103, 114, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). "Success is determined by the gross recovery,

**Exhibit B**

the number of individuals who benefit from settlements and verdicts, the degree to which plaintiffs are fully compensated, and the benefit to the public at large." *Id.* (citing *Deepwater Horizon*, 2016 WL 6215974, at *18); *see also In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F.Supp.2d 442, 472–73 (E.D.Pa. 2008).

In this litigation, the degree of success obtained for the entire state of West Virginia was substantial. The settlements reached in this litigation exceed by hundreds of millions of dollars the amounts West Virginia would have received from participating in Defendants' national opioid settlements. For example, the Distributor Settlement measured by its present value is more than double what West Virginia was expected to receive under the proposed National Distributor Settlement. These settlements will provide a substantial benefit to the public at large. In this litigation it is also clear that these results were only obtained because of the extraordinary and substantial common work and risk undertaken by those lawyers who created, developed, litigated, and tried these complex cases through highly contentious litigation.

The Panel established three separate trial tracks—one each for the Manufacturers, Distributors, and Pharmacies to be tried on an expedited basis. Each trial was a statewide trial on all Plaintiffs' public nuisance claims wherein Defendants' conduct would be adjudicated as to all Plaintiffs across the State. Throughout these proceedings, the lawyers leading this litigation invested enormous resources and time as described in greater detail above. This work, which the Panel charged appointed lead counsel and their respective teams to undertake with no guarantee of payment, was critical to the outcome of this litigation and was central to fulfilling the purpose of the Mass Litigation Panel. It further served the interests of all West Virginia political subdivisions and the State. *See In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1017 (5th Cir. 1977) ("By making manageable litigation that otherwise would run out of control,

**Exhibit B**

[leadership counsel] serve interests of the court, the litigants, the other counsel, and the bar, and the public at large, who are entitled to their chance at access to unimpacted courts.").

At bottom, in determining how to allocate the Attorney Fee Fund, consideration needs to be given as to whether it is more fair and reasonable to allocate more attorney fees to the lawyers who took on most of the risk, performed most of the critical work, and enhanced the value for all in this historically complex and risky litigation, or to those attorneys who performed most of their work in pursuit of their contingency fee contracts for specific clients.

Given the facts and circumstances in this case, and after considering the unique and significant results achieved through the creation of a statewide litigation settlement that far exceeded national settlements, together with the quality of the work performed for the common benefit, the complexity of the legal and factual issues implicated in this litigation, the skill and commitment of the lawyers, and the benefit conferred, the Commissioner recommends that it is most fair, reasonable, and equitable to allocate 27.5% of the Attorney Fee Fund ($35,215,922.50) to pay contingency fees for the representation of local governments and the remaining 72.5% of the Attorney Fee Fund ($92,841,977.50) to pay common benefit fees and the Attorney General's outside counsel's contingency fees. This allocation is consistent with the principle that more fees should be allocated to those who performed work and whose work provided *value* to the litigation and the results achieved.

### A. Distribution of the 27.5% Portion of the Attorney Fee Fund for Local Government Contingency Fees

27.5% of the Attorney Fee Fund after payment of litigation expenses is $35,215,922.50. Contingency fees are based upon a client's recovery. Exhibit C to the West Virginia First MOU specifies the percentage each County and City will recover from the Local Government (LG) Share

**Exhibit B**

of the Distributor settlement and the non-Distributor settlements.[16] Accordingly, the $35,215,922.50 to pay contingency fees should be divided into a Distributor settlement contingency fee amount and a non-Distributor settlement contingency fee amount based upon the ratios the Distributor and non-Distributor settlements bear to the total amount of settlements. This results in a Distributor settlement contingency fee amount of $14,966,767.10 and a non-Distributor contingency fee amount of $20,249,155.40.[17] Lawyer(s) representing a Local Government County or City should be paid a contingency fee equal to the sum of their client's Local Government share percentage for the Distributor Settlements specified in Exhibit C to the West Virginia first MOU times $14,966,767.10 plus their client's Local government share percentage for the non-Distributor Settlements specified in Exhibit C to the West Virginia first MOU times $20,249,155.40.[18]

**B. Distribution of the 72.5% Portion of the Attorney Fee Fund for the Attorney General's Outside Counsel's Contingency Fee and Common Benefit Fees**

72.5% of the Attorney Fee Fund after payment of litigation expenses is $92,841,977.50. The Commissioner recommends that this amount be used to pay the Attorney General's outside counsel's contingency fee and common benefit fees.

### 1. Attorney General's Outside Counsel's Contingency Fee

Motley Rice served as lead counsel in the Manufacturer and Pharmacy cases in its capacity as the Attorney General's outside special counsel. Motley Rice litigated those cases pursuant to *Written Determinations Appointing Outside Counsel of the Office of the West Virginia Attorney*

---

[16] Cabell County and Huntington are not part of the Distributor settlement in this litigation.

[17] The Distributor amount is 42.5% of the total contingency fees of $35,215,922.50, which represents the ratio the $400,000,000.00 Distributor settlements bear to the $940,386,000.00 in total settlements. The non-Distributor settlement is 57.5% of the total contingency fees of $35,215,922.50, which represents the ratio the $540,386,000.00 non-Distributor settlements bear to the $940,386,000.00 in total settlements.

[18] In the event that the intra-county percentages in Exhibit C differ by agreement or as a result of the dispute resolution process as specified in the MOU, those percentages shall apply to the calculation of contingency fees.

**Exhibit B**

*General* (RFP # 81 – Janssen Pharmaceuticals, Inc. and Johnson & Johnson), (RFP # 82 – Teva and Cephalon) (RFP # 91 – Walgreens, Rite Aid, CVS, and Walmart) ("Written Determinations"). Under the terms of the Written Determinations, Motley Rice agreed to perform all needed legal services on a contingency fee basis capped at 14% of the first $20 Million recovered and thereafter in accordance with subsection I of the Attorney General's Policy on Outside Counsel, which provides for: ten percent (10%) of any portion of the recovery between $20 million and $25 million; plus five percent (5%) of any portion of the recovery exceeding $25 million. Webb Law Centre was also appointed as special outside counsel pursuant to the Written Determinations and agreed to the above terms. Applying this formula to each of the Manufacturer and Pharmacy settlements in this litigation, the Commissioner recommends that Motely Rice and Webb Law Centre receive an aggregate contingency fee in this case of $41,655,050.00 from the 72.5% portion of the Attorney Fee Fund.[19]

However, because Motley Rice and Webb Law Centre were appointed and served as special assistant attorneys general in this consolidated litigation, the attorney fees payable to Motley Rice and Webb Law Centre are governed by W.Va. Code § 5-3-3A(h). West Virginia Code § 5-3-3A(h) caps the aggregate attorneys' fees recoverable for special assistant attorneys general at $50 million for all legal matters arising from a single event or occurrence like the opioid crisis at issue in this consolidated civil action irrespective of the number of lawsuits filed or the number of private attorneys retained to achieve the recovery. This statute clearly and unambiguously caps

---

[19] Specifically, Johnson & Johnson/Janssen settled for $99,000,000.00 which results in a $7,000,000.00 contingency fee under the Written Determination; Teva settled for $83,331,000.00 which results in a $6,216,550.00 contingency fee; Walgreens settled for $83,000,000.00 which results in a $6,200,000.00 contingency fee; CVS settled for $82,500,000.00 which results in a $6,175,000.00 contingency fee; Kroger settled for $68,000,000.00 which results in a $5,450,000 contingency fee; Walmart settled for $65,070,000.00 which results in a $5,303,500.00 contingency fee; Allergan settled for $51,200,000.00 which results in a $4,610,000.00 contingency fee; and Rite Aid settled for $5,000,000.00 which results in a $700,000.00 contingency fee.

**Exhibit B**

Motley Rice's and Webb Law Centre's total attorney fees across this litigation at $50 Million irrespective of whether they are paid contingency fees for serving as special assistant attorney general, contingency fees for representing local governments, or common benefit fees. Therefore, the aggregate total of Motley Rice's and Webb Law Centre's contingency and common benefit fees for all cases and work done in connection with this mass litigation must comply with W.Va. Code § 5-3-3A(h) and is capped at $50 Million. In the event the total amount of fees payable to Motley Rice and Webb Law Centre set forth in this Recommendation exceed the $50 Million cap, their fees shall be reduced so that the combined total of all their attorneys' fees remain within the $50 million cap. Any amount by which such attorneys' fees are reduced shall be treated as residue funds and addressed in accordance with the procedures set forth below.[20]

Application of the $50 Million cap will result in Motley Rice and Webb Law Centre receiving no common benefit attorneys' fees in connection with this mass litigation. The Commissioner finds this result fair and reasonable because these attorneys are receiving the maximum amount of attorney fees allowed under the statutory cap. Moreover, these attorneys are receiving contingency fees of $41,655,050.00 based upon the entire recovery in the Manufacturer and Pharmacy settlements and not the amount received by their clients from these settlements under the West Virginia First MOU, which effectively pays these lawyers for the benefit their work bestowed on all Plaintiffs.

2.  <u>Common Benefit Fees</u>

---

[20] By way of example, if Motley Rice and Webb Law Centre were hypothetically to receive $8,500,000.00 in Local Government contingency fees, then their total attorneys' fees for work in this mass litigation when added to their $41,655,050.00 attorney general contingency fee would be $50,155,050.00. Since this amount exceeds the statutory cap, their total attorneys' fees would then be reduced by $155,050.00 to comply with the statutory cap.

**Exhibit B**

After deducting the Attorney General Outside Counsel contingency fee there remains $51,186,927.50 of the 72.5% portion of the Attorney Fee Fund. The Commissioner recommends that this amount be used to pay common benefit fees.

The allocation of common benefit fees "is not an exact science," and the methodology used may vary, so long as it is designed to produce results that are both fair and reasonable. *In re C.R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2019 WL 4458579, at *15 (S.D.W. Va. Mar. 12, 2019), report and recommendation adopted, No. MDL 2187, 2019 WL 3385174 (S.D.W. Va. July 25, 2019). "As a general principle, ... [attorneys'] fees are to be allocated in a manner that reflects the relative contribution of the individual firms and attorneys to the overall outcome of the litigation." *Id.*, at *14. The allocation of attorney fees in common fund cases such as the present is usually determined by utilizing one of the following methods: (1) the lodestar method, (2) the percentage method, or (3) the blended method which combines the first two approaches. *In re Cook Med., Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 365 F. Supp. 3d 685, 695 (S.D.W. Va. 2019) (citing Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 381 (2014)).

Under the facts and circumstances of this litigation, the lodestar approach—i.e., to simply total the hours submitted, apply an hourly rate, and then determine the fee on that basis alone—is not appropriate for several reasons. ***First***, not all hours are created equal. As stated by Judge Fallon in *In re Vioxx Prod. Liab. Litig.*,

> In a case of this kind, not all types of work are created equal. Hours spent taking depositions, participating in hearings, or trials, actively participating in developing the appropriate litigation strategies and tactics (through moot court presentations or similar practices), drafting briefs, actively participating in Court conferences, arguing motions, negotiating with opposing counsel to reach a settlement, and actively managing and organizing the administrative aspects of the case are some of the more significant types of work that a case

24

**Exhibit B**

> of this sort requires and deserves the most recognition. This, of course, is not the only type of work that such a case requires. Documents must be reviewed, categorized, and analyzed; e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored. This work, while necessary and often time consuming does not deserve equal treatment when allotting fees.

*In re Vioxx Prod. Liab. Litig.*, 802 F. Supp. 2d 740, 772 (E.D. La. 2011). In short, there is a hierarchy of value for work that tends to have a greater impact on the litigation and generates more "common benefit." Such work deserves greater compensation. *Id*.

**Second**, a general overview of the time submissions for each firm made clear that there were issues with respect to the records submitted by various firms including, time that conferred little or no common benefit, time working on individual cases or clients, time related to work performed with respect to cases outside the MLP, time for work that was not approved by lead counsel, excessive time submissions, inadequate descriptions of the tasks performed, duplicative time submissions, times entries submitted by multiple attorneys with the same firm for tasks that required one or fewer attorneys, block-billing time entries, time submitted that was inconsistent with the procedural posture of the case, other inaccuracies not in compliance with the Panel's orders, and time records that generally did not appear to be facially accurate. There were also significant differences in the quality of record keeping between the various firms. Accordingly, a precise loadstar calculation in this case would be arbitrary, unsupported by the realities of the varying time keeping practices, and disconnected from measuring the *value* the work actually afforded the litigation.

**Third**, the lodestar method is the least consistent with the purpose of common benefit fees. The purpose of common benefit fees is to materially recognize counsel for work which inured to the common benefit of the litigation as a whole. *In re Vioxx Prod. Liab. Litig*., 802 F. Supp. 2d

**Exhibit B**

740, 773 (E.D. La. 2011). As such, when considering common benefit fees, it is the "*value* of the time expended"—and not merely the *amount* of time expended that is most relevant. *In re Copley Pharmaceutical, Inc., Albuterol Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1149-50 (D. Wyo. 1999) ("This Court's research reveals that courts unanimously make allocations based upon the quantity and quality of effort expended by the attorneys in obtaining the common fund.") (emphasis added) (internal citations and quotations omitted). The lodestar method gives the least amount of consideration to value, and instead tends to reward "the professional biller or the inefficient worker." *In re C.R. Bard, Inc.,* 2019 WL 4458579, at *14. Additionally, mechanically calculating hours and allocating fees solely on that basis as required under the lodestar method "incentivize[s] padded hours and diminish[es] the work that truly moved the litigation toward its conclusion." *In re Vioxx Prod. Liab. Litig.,* 802 F. Supp. 2d at 772.

In this case, the most fair and reasonable approach is to use a hybrid approach to arrive at an allocation based upon the Commissioner's review of the hours and work descriptions submitted by each law firm in light of the Panel's directives set forth in its prior common benefit orders; consideration of the ultimate purpose of providing compensation for "work done to advance the greater good for all Plaintiffs," (Transaction ID 67071292); and evaluating the *value* and the *quality* of the work performed by each firm with respect to the overall outcome of the litigation.

In employing this methodology, particular emphasis was given to work that "truly move[ed] litigation toward its conclusion" and was done "on behalf of the whole." *In re Vioxx Products Liability Litigation*, 802 F.Supp.2d 740, 772-73 (E. D. La. 2001); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 311 (1st Cir. 1995).[21]

---

[21] *In re Thirteen Appeals*, 56 F.3d at 311 (explaining that individually retained plaintiffs' attorneys who, though not members of the PSC, prepared and/or tried "representative" cases deserved compensation for their endeavors on behalf of the whole because they labored as representative counsel, conferred a common benefit, and must be compensated accordingly*); In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig.*, 553 F. Supp. 2d

**Exhibit B**

Accordingly, when considering the value of common benefit work, as stated before and which bears reemphasizing here, "all hours are not created equal." For example, trial and deposition work should be considered more valuable than hours on other tasks, such as administrative tasks. *In re C.R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2019 WL 4458579, at *14 (S.D.W. Va. Mar. 12, 2019), *report and recommendation adopted*, No. MDL 2187, 2019 WL 3385174 (S.D.W. Va. July 25, 2019); *In re Vioxx*, 802 F.Supp.2d at 772 (listing deposition, trial preparation and strategy, and trial work among the work that deserves the most recognition and highest compensation in mass litigation cases given that such work "tends to have a greater impact on the litigation and generate more 'common benefit'"). Other examples of the type of work courts have deemed deserve the most common benefit include serving as lead counsel; preparing and arguing motions; appellate work and briefing; acting as first chair in depositions; working with experts to prepare them to testify; deposing defense experts; guiding the direction of the case; developing litigation strategy; playing a key role in bringing about settlement; being immediately prepared for trial, if necessary; contributing large amounts of quality legal work and time; and providing leadership essential to resolution. *Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 811-821 (E.D. La. 2008) ("Common benefit fund apportionment is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of other counsel.").[22]

---

442, 490 (E.D. Pa. 2008), as corrected (Apr. 9, 2008), *judgment entered*, No. CIV.A. 99-20593, 2008 WL 2890878 (E.D. Pa. July 21, 2008), and *aff'd sub nom. In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) (awarding attorneys for common benefit efforts, including coordinating mass litigation, performing administrative tasks that would have otherwise fallen on the court, and conducting generic discovery); *see also* Matthew G. Chapman, The Honorable Joseph K. Reeder, and Jonathan G. Brill, *Practitioner's Guide to Attorney Fees in West Virginia*, 122 W. Va. L Rev. Online 1 (2019), https://wvlawreview.wvu.edu/west-virginia-law-review-online/2019/09/16/practitioner-s-guide-to-attorney-fees-in-west-virginia#_ednref121 (noting that to be entitled to a common fund fee, an attorney's work must "in fact generate the common fund") (citing William B. Rubenstein, Newberg on Class Actions § 15.54 (5th ed. 2011).

[22] Of course, "[d]ocuments must be reviewed, categorized, and analyzed; e-mails must be read and responded to; claimants must be kept advised; meetings must be attended and in general the litigation must be monitored." *Id.* at

**Exhibit B**

In evaluating the submitted work, the Commissioner found work descriptions more informative of common benefit than simply adding up time logged for work performed. These descriptions more accurately demonstrated which lawyers and/or law firms were performing work that truly advanced the case and created value. The Commissioner did not simply count time, but evaluated whether an attorney's work truly added value and advanced this litigation and how that work contributed to the overall outcome.  In so doing, the Commissioner considered, *inter alia*, the nature, quantity, and duration of the work performed; the identity of the attorneys performing the work and their respective experience and abilities; and whether and to what extent the work contributed to the overall common benefit of the West Virginia local governments and the State. The Commissioner also considered the length of each firm's involvement in this litigation, whether attorneys in the firm assumed a leadership role, the experience and quality of the attorneys performing the work, and to what extent each law firm advanced expenses to fund this litigation.

The Commissioner afforded each attorney seeking common benefit the opportunity to appear in person to present information for the Commissioner to consider in awarding common benefit, and the Commissioner personally interviewed those attorneys who appeared. The Commissioner also received recommendations from lead trial counsel for the Manufacturer, Distributor, and Pharmacy cases, who through their roles as lead counsel, are intimately familiar with the work performed by each of the law firms with respect to common benefit and the quality and nature of work performed by each firm.  *See Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 90 (2d Cir. 2010) ("Since lead counsel is typically well-positioned to weigh the relative merit of other counsel's contributions, it is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation of attorneys' fees, particularly ... where the

---

811. However, "[t]his work, while necessary and often time consuming, does not deserve equal treatment when allotting fees." *Id.*

**Exhibit B**

district court retains the ultimate power to review applications and allocations and to adjust them where appropriate."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6909680, *2 (N.D. Ca. 2016) ("In class actions lead counsel commonly propose the initial plan of fee allocation since 'class counsel are the most familiar with the amount of work actually contributed by each of the ... firms,' and can assess 'in a manner that they believe, in good faith, reflects the contributions of counsel to the prosecution and settlement of the claims.' ") (Citations omitted).

The Commissioner was also uniquely situated to evaluate common benefit work having personally observed work performed by the attorneys in his role as Discovery Commissioner for the entire Mass Litigation, and in his role assisting with mediations. This afforded the Commissioner significant interaction with all the attorneys involved in this litigation. The Commissioner's roles in this consolidated Civil Action, as well as serving his role as Special Master in CT2, further afforded him significant exposure to the nature of this complex litigation and those attorneys who actually contributed to the substantial common benefit achieved in these statewide settlements.

Based upon the Commissioners' comprehensive review of the time records, materials, and information submitted by each firm, and after evaluating each firm's overall contribution to the common benefit of this litigation and accordance with the principles and methodologies discussed herein, the Commissioner recommends that the following amounts be paid for common benefit fees:

- **Allen, Chesson & Grimes (Anna Majestro)**: $50,000.00

- **Chafin Law Firm**: $850,000.00

- **Farrell Fuller / Powell Majestro**: $20,150,000.00

- **Fitzsimmons Law Firm**: $22,500,000.00

**Exhibit B**

- **Forbes Law Firm**: $15,000.00

- **George & Lorenson**: $25,000.00

- **Harry Bell**: $25,000.00

- **Harris & Holmes**: $1,000,000.00

- **Irpino, Avin & Hawkins**: $2,000,000.00

- **Linkous Law**: $1,850,000.00

- **Lisa Ford**: $46,927.50

- **Mullens & Mullens**: $100,000.00

- **Morgan & Morgan**: $500,000.00

- **Napoli Shkolnik**: $1,250,000.00

- **Robert L. White**: $25,000.00

- **Skinner Law Firm**: $250,000.00

- **Troy Law Firm**: $25,000.00

- **Warner Law Offices**: $25,000.00

- **Warren McGraw Law Firm**: $250,000.00

- **Wooton, Davis, Hussell & Johnson**: $250,000.00

The Commissioner recognizes that a large portion of the 72.5% portion of the Attorney Fee Fund for the Attorney General's outside counsel's contingency and common benefit fees is being paid to those law firms who were appointed and served as lead trial counsel. This recommendation, however, is being made only after careful consideration and in recognition of the unique and extraordinary value these law firms added to the outcome of this litigation, which exceeds by hundreds of millions of dollars what West Virginia would have likely received outside this litigation. The Commissioner also notes that those law firms which did not serve as lead counsel

**Exhibit B**

will receive significant compensation through their contingency fees which will reasonably compensate them for their non-common benefit work.

## V.  <u>PAYMENT SCHEDULE</u>

The Commissioner recommends that all reimbursable litigation expenses and 50% of all attorney fees should be paid upon entry of the Panel's Order regarding attorney fees and litigation expenses; 25% of all attorney fees should be payable November 1, 2024; and 25% of all attorney fees should be payable November 1, 2025. The MDL assessment should be paid annually in 5 equal annual installments on each November 1st for 5 years beginning November 1, 2023.

## VI. <u>RESIDUAL ATTORNEY FEES AND FUTURE RECOVERIES GOVERNED BY THE WEST VIRGINIA FIRST MOU</u>

The Commissioner recommends that the formulas and percentages set forth herein with respect to the payment of gross attorney fees, reimbursement of litigation expenses, the MDL assessment, allocation and payment of local government contingency fees, and allocation and payment of common benefit fees shall apply to (1) any residual monies remaining in the Attorney Fee Fund, and (2) any future recoveries governed by the West Virginia First MOU.

*******

For the reasons set forth above, the Commissioner respectfully recommends that the Panel adopt this **RECOMMENDATION** and order the same regarding the payment and allocation of attorneys' fees and expenses.

**DATED:**  September 21, 2023.

/s/ Christopher C. Wilkes
Christopher C. Wilkes
Common Benefit Fund Commissioner

**Exhibit B**